**CONTAINAIR SYSTEMS CORPORATION, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**LOCAL 295, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, Respondent.**

**Nos. 639, 812, Dockets 74–2098, 74–2132.**

United States Court of Appeals, Second Circuit.

Argued March 31, 1975.

Decided June 18, 1975.

John F. Gibbons, New York City (Eugene T. D'Ablemont, Irving Brand, Kelley, Drye, Warren, Clark, Carr & Ellis, New York City, of counsel), for petitioner Containair Systems Corp.

John G. Elligers, Atty., N.L.R.B., Washington, D. C. (Peter G. Nash, Gen. Counsel, John S. Irving, Deputy Gen. Counsel, Patrick Hardin, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Robert A. Giannasi, Asst. Gen. Counsel, N.L.R.B., Washington, D. C., of counsel), for N.L.R.B.

Before ANDERSON, MANSFIELD and OAKES, Circuit Judges.

MANSFIELD, Circuit Judge.

Containair Systems Corporation ("Containair" herein), charging party in an unfair labor practice proceeding before the National Labor Relations Board ("the Board" herein), petitions this Court for review of a Board order, entered over Containair's objection, following consent to the order by the respondent, Local 295, International Brotherhood of Teamsters ("the Union" or "Local 295" herein). Containair objects to the inclusion in the order of the qualification that "[i]t is understood that the signing of this stipulation by the Respondent does not constitute an admission that it has violated the Act." Petitioner argues that, in view of Local 295's history of repeated egregious violations of the National Labor Relations Act, it was an abuse of discretion for the Board to stipulate to an order that does not require the Union to admit its wrongdoing.

Containair further argues that the Board failed adequately to explain why such an admission was not included in the order. Under the circumstances of this case, we conclude that the Board did not abuse its discretion in agreeing to the settlement, and therefore deny the petition and enforce the order.

Containair, located in Springfield Gardens, Queens, is engaged in the manufacture, sale, and distribution of pilferproof containers and related products for use by airlines and other freight companies, and in the business of packing cargo for transport by air. On February 22, 1974, Local 295 called a strike of Containair's employees in support of its demand that the company recognize it as collective bargaining agent of Containair's employees. In support of this strike, Union agents and pickets threatened physical harm to employees and supervisors of Containair and threatened damage to property in order to aid the Union and to coerce employees into refusing to cross the picket line which Local 295 had established at Containair's plant. Also in support of the strike, Union officials ordered Local 295 members employed by Emery Air Freight Corporation ("Emery" herein), an air freight forwarding company whose employees are represented by Local 295, to refuse to work on or handle freight or material received from Containair at Emery's facility at John F. Kennedy International Airport in Jamaica, Queens.

On February 25, 1974, Containair filed two charges with the Board's Regional Office, alleging that Local 295 had violated § 8(b)(1)(A) of the Act, 29 U.S.C. § 158(b)(1)(A), by restraining and coercing employees in the exercise of their Section 7 rights, and alleging violation of § 8(b)(4)(B), 29 U.S.C. § 158(b)(4)(B), by seeking to force a neutral employer, Emery Air Freight, to cease doing business with Containair. On March 6 the Regional Director issued a consolidated complaint against the Union incorporating these charges of threats and coercion violating § 8(b)(1)(A) and secondary activity in violation of § 8(b)(4)(B).

On March 7, 1974, the Regional Office proposed a settlement stipulation to which the Union agreed on March 12. The stipulation provided for entry of Board and Court orders requiring the Union to cease and desist from the alleged unfair labor practices, and further requiring the Union to post a notice to employees, to furnish signed copies of this notice for posting at affected employers, and to notify Emery in writing that the Union had no objection to Emery's doing business with Containair. The stipulation contained a provision stating that the signing of the agreement would not constitute an admission that the Union had violated the Act. By signing the stipulation, the Union waived further proceedings before the Board and defenses in a Court enforcement proceeding.

On March 18, 1974, Containair opposed the settlement's failure to require an admission of guilt, basing its opposition primarily on the grounds that Local 295 was a "persistent wrongdoer" and that Containair employees "are entitled to receive *from official sources* a truthful picture of the Unions' unlawful conduct. . . . ." After considering Containair's objections, the Regional Director amended the proposed order to follow more closely allegations in the complaint regarding picket line misconduct, and added an additional paragraph enjoining not only the threats against Containair employees and supervisors but also "[i]n any like or related manner restraining or coercing employees of Containair or any other employer, in the exercise of rights guaranteed by Section 7 of the Act." [1]

1. The final order thus in part required Local 295 to cease and desist from:

"(a) Threatening employees and supervisors of Containair Systems Corporation, herein called Containair, or any other employer, to inflict injury, or threatening to inflict damage with an object to induce employees of Containair or any other employer to support and assist Local 295, or not to cross the picket line established by Local 295 at Containair's plant.

"(b) In any like or related manner restraining or coercing employees of Containair or any other employer, in the exercise of the rights guaranteed by Section 7 of the Act.

"[(c)] In any manner or by any means, including strikes, work stoppages, picketing, threats, orders, directions, instructions, requests or appeals, however given, made or imparted, or by any like or related acts or conduct, or by permitting any such to remain in existence or effect, engaging in, or inducing or encouraging any individual employed by Emery Air Freight Corporation, herein called Emery, or by any other person engaged in commerce or in an industry affecting commerce, to engage in a strike, work stoppage, or a refusal in the course of his employment to use, transport, or otherwise handle or work on any goods, articles, materials or commodities or to perform any services, or in any manner or by any means, threatening, coercing or restraining Emery or any other person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is to force or require Emery or any other person, to cease

doing business with Containair or any other person."

The Notice included in the order stated:

"NOTICE TO
MEMBERS
Posted by Order of the
National Labor Relations Board
An Agency of the United States
Government

"WE WILL NOT threaten employees and supervisors of Containair Systems Corporation, or any other employer, to inflict injury, or threaten to inflict damage with an object to induce employees of Containair or any other employer to support and assist Local 295, or not to cross the picket line established by Local 295 at Containair's plant.

"WE WILL NOT in any manner or by any means, including strikes, work stoppages, picketing, threats, orders, directions, instructions, requests or appeals, however given, made or imparted, or by any like or related acts or conduct, or by permitting any such to remain in existence or effect, engage in, or induct or encourage any individual employed by Emery Air Freight Corp., or by any other person engaged in commerce or in an industry affecting commerce, to engage in a strike, work stoppage, or a refusal in the course of his employment to use, transport, or otherwise handle or work on any goods, articles, materials or commodities or to perform any services, or in any manner or by any means, threaten, coerce or restrain Emery Air Freight Corp., or any other person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is to force or require Emery

The Regional Director concluded, however, that the non-admission clause was proper. After Containair again renewed its objections, the stipulation was submitted to the Board with the recommendation that the order be issued.

The Board dismissed Containair's objections, holding in a written opinion that the order fully remedied the allegations of the complaint, and pointing out that the efficacy of the order was unaffected by the non-admission clause. In view of the stipulation's provisions for a formal Board Order and a consent court judgment, the Board concluded that it would effectuate the policies of the Act to approve the stipulation.

## DISCUSSION

 The National Labor Relations Act does not give private rights to victims of unfair labor practices. *Amalgamated Utility Workers v. Consolidated Edison Co.*, 309 U.S. 261, 60 S.Ct. 561, 84 L.Ed. 738 (1940); *Local 282, Teamsters v. NLRB*, 339 F.2d 795, 799 (2d Cir. 1964). Rather the Board's General Counsel determines whether to issue a complaint and the theory on which it should proceed. "[B]y the same token he has power to consider and decide whether the public interest would be better served by settlement . . .." *Local 282, supra* at 799. The Board exercises

broad discretion in the selection of remedies, *Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 216, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964); *Amalgamated Local Union 355 v. NLRB*, 481 F.2d 996, 1006 (2d Cir. 1973); *Lipman Motors, Inc. v. NLRB*, 451 F.2d 823, 828–29 (2d Cir. 1971), and in determining whether a particular case should be settled, *International Ladies Garment Workers Union Local 415–475 v. NLRB*, 163 U.S.App. D.C. 263, 501 F.2d 823, 831 (1974); *Concrete Materials of Georgia, Inc. v. NLRB*, 440 F.2d 61, 68 (5th Cir. 1971).

Appellant urges, however, that the Board abused its discretion in this case, since the settlement does not adequately protect public rights under the Act which it is the Board's role to defend, see *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 193, 61 S.Ct. 845, 85 L.Ed. 1271 (1940); *Amalgamated Utility Workers, supra.* Containair first details by reference to Local 295's numerous appearances before the Board and this Court the Union's rather sordid history of numerous infractions of the labor laws. If Local 295's history before the Board and in the courts is any criterion, this Union has not hesitated to resort to lawlessness as an organizational weapon, with disdain for the public interest and the underlying purpose of the National Labor Relations Act, which is to promote industrial peace.[2]

---

Air Freight Corp., or any other person, to cease doing business with Containair Systems Corporations, or any other person.

"WE WILL NOT in any like or related manner restrain or coerce employees of Containair or any other employer, in the exercise of the rights guaranteed by Section 7 of the Act.

[Signed by Local 295]."

**2.** In *Teamsters Local 295 (Emery Air Freight Corp.)*, 197 N.L.R.B. 26, 80 L.R.R.M. 1284 (1972), enf'd, 82 L.R.R.M. 3091, Dkt. No. 72–1975 (2d Cir. Mar. 5, 1973), the Board upheld a trial examiner's decision finding that the Union had struck when the Employer refused to sign a contract containing terms at variance with those to which the parties had previously agreed, thus violating § 8(b)(3). In *Teamsters, Local 295 (R. M. & W. of Broadway, Inc.)*, Case Nos. 29–CP–227 & 29–CP–230 (Nov. 19,

1973), a case settled by a stipulated order, Local 295 was charged with and agreed to desist from picketing R. M. & W. to cause the employer to recognize and bargain with it at a time when the employer had validly recognized, and had a contract with, a rival local and no representation question could validly be raised. See also *Teamsters, Local 295 (Teamsters, Local 917)*, Case Nos. 29–CA–3473 & 29–CB–1554 (Nov. 19, 1973), requiring Local 295 to refrain from enforcing the agreement it had illegally entered with R. M. & W., and refund dues collected from employees under the agreement. In another case settled by stipulation, *Teamsters, Local 295 (Air Line Freight, Inc.)*, Case No. 29–CC–387 (Jan. 28, 1974), the Union was charged with and agreed to desist from engaging in a secondary boycott involving numerous employers directed against Air Line Freight, which was motivated by the fact that certain Air Line employees were members of a rival local. Finally, in *Team-*

Having made out a case that Local 295 can fairly be characterized as a recidivist union, Containair points to a number of cases involving parties who have repeatedly or continuously violated the Act, in which the Board and courts have recognized the need for more stringent and imaginative orders. In *J. J. Hagerty, Inc.*, 139 N.L.R.B. 633, 51 L.R.R.M. 1349 (1962), *enf'd in part sub nom. Local 138, Operating Engineers v. NLRB*, 321 F.2d 130 (2d Cir. 1963), for instance, upon proof that a union had continued to operate a discriminatory hiring and referral system despite Board orders and enforcement decrees this Court enforced an unusual remedial provision decreed by the Board requiring the Union to keep and make available full records of the operation of its hiring hall. Containair also cites the legendary struggles of the Board with J.P. Stevens & Company, in which the Board, faced with persistent antiunion activity by that company, sought increasingly drastic remedies, many of which have been enforced. See, e. g., *J.P. Stevens & Co.*, 183 N.L.R.B. 25, 75 L.R.R.M. 1407 (1970), *enf'd*, 461 F.2d 490 (4th Cir. 1972); *Textile Workers Union v. NLRB (J.P. Stevens & Co.)*, 388 F.2d 896 (2d Cir. 1967); *J. P. Stevens & Co. v. NLRB*, 380 F.2d 292 (2d Cir.), *cert. denied* 389 U.S. 1005, 88 S.Ct. 564, 19 L.Ed.2d 600 (1967).

Containair argues that at a minimum this case should be remanded to the Board for a more adequate explanation of why, in view of this Union's history of disregard for the law, the provisions sought by appellant were not imposed. In support of remand appellant relies on *Textile Workers Union v. NLRB*, 154 U.S.App.D.C. 389, 475 F.2d 973 (1973) (*per curiam*), which held inadequate the Board's explanation of its rejection of the union's requests for broader relief, in view of the Board's apparent failure to

take into account J.P. Stevens' history of unfair labor practices. See also *NLRB v. General Stencils, Inc.*, 438 F.2d 894, 905 (2d Cir. 1971); *Electrical Workers v. NLRB (Tiidee Prods., Inc.)*, 138 U.S.App. D.C. 249, 426 F.2d 1243, 1250, *cert. denied sub nom. Tiidee Prods., Inc. v. Electrical Workers*, 400 U.S. 950, 91 S.Ct. 239, 27 L.Ed.2d 256 (1970).

■■■ Without doubt the Board has a duty in a litigated case to employ broader and more stringent remedies against a recidivist than those usually invoked against a first offender, particularly where normal remedies have proved to be ineffective after earlier proceedings. Otherwise the Board might fail to carry out the mandates of § 10(c) of the Act, 29 U.S.C. § 160(c), which obligates it to order a proven violator "to take such affirmative action . . . . as will effectuate the policies of this act." See *NLRB v. J.H. Rutter-Tex Mfg. Co.*, 396 U.S. 258, 262, 90 S.Ct. 417, 24 L.Ed.2d 405 (1969); *Electrical Workers v. NLRB (Tiidee Prods., Inc.)*, *supra*, 426 F.2d at 1249. In the present case, however, the essential condition precedent to the Board's invocation of more stringent remedies is missing. Here, unlike the situation in decisions relied upon by Containair, we are not dealing with a successfully litigated prosecution of unfair labor practices that has culminated in findings of a violation based upon evidence introduced at a hearing and subjected to cross-examination, but with a settlement. The order is based solely upon a stipulation, entered into as the basis of an order only with the respondent's consent. The stipulation, of course, reflects a considered compromise by both sides. It undoubtedly represents the most by way of relief that the Board believes that it could achieve short of full litigation. Should the Board insist

sters, Local 295 (Jet Air Freight, Copeland Shipping, Inc., Copeland Importing Serv., Inc. & CAS Trucking Corp.), Case Nos. 29–CB–1624–1, 29–CB–1624–2 & 29–CB–1624–3 (Mar. 28, 1974), the Board adopted the conclusions of the Administrative Law Judge that Local 295, by picketing and strike threats, gained

recognition of certain employees at a time when a rival union was conducting a representation campaign and when a real question concerning representation thus existed. Local 295's activities constituted a coercion of § 7 rights in violation of § 8(b)(1)(A).

upon the admission of guilt demanded by Containair, the Union would in all probability refuse to settle, immediate injunctive relief would be scuttled, and the parties would be relegated to the delay and expense of pretrial preparation and hearings, with no assurance as to the content or scope of the ultimate findings or the relief that would be granted.

The question before the Labor Board, therefore, was whether the advantages to be derived from requiring a clause admitting guilt outweighed these risks and other considerations. The principal reason advanced by Containair in support of either a litigated finding or an admission of guilt is that in a pending representation election Containair's employees are entitled to "the truth as to whether the Union can threaten them with impunity." This hardly justifies a holding that the settlement does not adequately protect the rights of the public or that its approval by the Board represented an abuse of discretion.

█ Although the interests of a charging party must be taken into consideration in determining whether to settle or litigate unfair labor practice charges, the ultimate decision turns upon a careful weighing of other relevant and conflicting considerations. That balancing procedure must be left primarily to the Board, which may call upon its own expertise in the field of industrial relations. A private party may not require the Board to litigate merely in order to obtain a finding that the Union is "guilty." *Local 282, supra,* 339 F.2d at 799. Even if an unfair labor practice proceeding is intended to serve a public informational purpose, a proposition which is not certain, it is clear that admissions of guilt or full trials cannot be required whenever demanded by the charging party, since the effect would be to render nugatory the Board's power to choose settlement in those cases where speed of remedy and savings of resources outweigh the desirability of pressing the charge, see *Local 282, supra.*

Little purpose would be served in forcing this particular case to litigation. It is not as if the Board has never prosecuted Local 295; the Union has at least twice been adjudged guilty of unfair labor practices, see *Teamsters Local 295 (Emery Air Freight),* 197 N.L.R.B. 26 (1972), *enfd.,* 82 L.R.R.M. 3091, Dkt. No. 72–1975 (2d Cir. March 5, 1973); *Teamsters Local 295* (Jet Air Freight), N.L.R.B. Case No. 29–CB–1624 (March 29, 1974), and once has been held liable in this Court for civil contempt. That Local 295 had been adjudged guilty of an unfair labor practice would thus come as no revelation to anyone familiar with the public record of this Union; from the public's perspective, another unfair labor practice adjudication would be merely "cumulative evidence."

█ Undoubtedly the Containair management might gain a tactical advantage in the forthcoming representation election if it were able to post on its bulletin boards the confession or adjudication of guilt of Local 295 for violating the rights of Containair's workers. But again, given the wealth of public information concerning Local 295's dismal record, management should have little difficulty bringing to the employees' attention Local 295's record and management's view of the nature of its behavior. Nor is management precluded from explaining to the workers their Section 7 rights if the workers do not understand them. As to the election itself, the Board will usually not proceed with an election until the effects of unfair labor practices have been remedied. See B. Meltzer, Labor Law, p. 263 (1970). In making that decision here the Board should take into account any continuing effects of the Union's conduct in its scheduling and supervision of any representation election involving Local 295 at Containair.

█ Since no essential informational purpose would be served by requiring an admission or adjudication of guilt in this case, even with respect to the pending

election, the only purpose of such a remedy would be to make less likely the Union's chance of winning the election.[3] While this might indeed be a deterrent to the Union, exertion of this sort of pressure on the Union is at best an indirect method of remedying the unfair labor practice charged.

 While there would be nothing improper about the Board insisting on an admission of guilt clause or that the unfair labor practice charges be litigated, the inclusion of such a clause solely for the purpose of favoring one party in a representation election might render the order punitive, rather than remedial, in character. *Cf. Local 60, Carpenters v. NLRB*, 365 U.S. 651, 655, 81 S.Ct. 651, 6 L.Ed.2d 1 (1961); *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 236, 59 S.Ct. 206, 83 L.Ed. 126 (1938); *National Cash Register Co. v. NLRB*, 466 F.2d 945, 967–68 (6th Cir. 1972), *cert. denied sub nom. NCR Employees' Ind. Union v. NLRB*, 410 U.S. 966, 93 S.Ct. 1442, 35 L.Ed.2d 700 (1973). Furthermore, as noted in the Board's opinion, it is very unlikely that the presence of the non-admission clause would affect the enforceability of the Board's order by way of a contempt action. *See NLRB v. Ochoa Fertilizer Corp.*, 368 U.S. 318, 323, 82 S.Ct. 344, 7 L.Ed.2d 312 (1961). Indeed, after the initial objections by Containair, the Board persuaded the Union to agree to a broad injunction requiring the Union to cease and desist not only from the specific conduct of which it had been accused, but also from coercing the employees of Containair *or any other employer* "[i]n any like or related manner," and from engaging in the secondary activities against Emery "or any other person . . ." where the object is to force such person to cease doing business "with Containair or any other person." By virtue of the Union's consent to this order, the Board is freed of the possibility of challenge by the Union to the order's scope. *See NLRB v. International Hod Carriers' Union, Local 210*, 228 F.2d 589, 592 n.3 (2d Cir. 1955).

The Board, undoubtedly due in part to pressure from charging parties, has apparently begun to issue against Local 295 broad remedial orders of the type issued here. Shortly before the events here another such order was issued in *Teamsters, Local 295 (Air Line Freight, Inc.)*, N.L.R.B. Case No. 29–CC–387 (1974), a case involving secondary boycott activities directed at Air Line Freight, whose employees were represented by a rival local. Broad remedial orders of this type are reserved by the Board for cases in which "a proclivity to violate the Act is established, either by the facts within a particular case, or by prior Board decisions against the respondent at bar based upon similar unlawful conduct in the past," *Teamsters Local 70 (C & T Trucking Co.)*, 191 N.L.R.B. 11, 77 L.R.R.M. 1336 (1971) (footnotes omitted), since in such cases it can be anticipated that the respondent will engage in similar activities against other employers in the future. *See NLRB v. Operating Engineers (Cafasso Lathing & Plastering, Inc.)*, 377 F.2d 528, 530 (2d Cir. 1967).

In view of Local 295's history and the *Air Line Freight* decision, the Board might well have abused its discretion if it had adhered to its original position and had refused to grant the broader injunction. But since it did modify its original order to this extent it cannot be said that the Board failed to take account of the Union's past conduct in framing its relief or that the Board is merely continuing to issue narrow cease and desist orders which might easily be circumvented by Local 295. Now that broad remedial injunctions have been obtained, the Board has a basis for prosecution of the Union for contempt if it

---

**3.** Another possible objective of Containair, indicated in its March 18 letter, is to obtain evidence of violation of the law by Local 295 usable in other proceedings against the Union, including a § 303 action that is currently pending. The pendency of that private action clearly provides no reason to require the Board to proceed with full litigation. *Concrete Materials of Georgia, Inc. v. NLRB*, 440 F.2d 61, 68 (5th Cir. 1971).

should continue its violations, even though its future transgressions involve different employers. We have no reason to believe the Board will not pursue such a course, or that contempt actions against the Union will not be effective.[4]

It cannot therefore be said that the Board has abused its discretion in entering into this settlement. The petition is denied and the order enforced.

4. Since Local 295's secondary activities in this case seem to violate the terms of the order entered in *Air Line Freight*, it is not clear why the Board did not seek to prosecute the Union for contempt of the previous injunction.